Good morning, ladies and gentlemen. We have seven cases on our calendar this morning. Four patent cases, two government employee cases, a government contract case, and two government employee cases, and a contract case. One of the patent and one of the employee cases has submitted on the briefs and will not be argued. So we have five argued cases. The first two, Carnegie Mellon v. Hoffman-LA Roche, 1266 and 1267. You had asked when you came in, I didn't think we had a motion on the issue to have them argued together. It might have been useful to have had a motion, but we're not going to stand on technicalities. We'll let you do that. It's perhaps rather doubtful that you need 30 minutes on each side, so don't just chew over the same stuff again and again. We'll let you argue both cases together, 20 minutes, 30 minutes, 10, maximum, on each side. So, Mr. Collin, if you want to begin with the two cases. Your Honor, thank you very much, and I do apologize for not following a motion asking the Court to permit us to argue these together. I am Fred Collin, and I'm pleased to be here on behalf of Carnegie Mellon University and Three Rivers Biologicals, who were the plaintiffs in the first case, the appellants, and Carnegie Mellon University, who was the plaintiff appellant in the 1267 appeal. These matters have been fully briefed. The Court has five decisions from the Northern District of California. Have all these patents expired? Yes, Your Honor, they have. They all expired in 2005. When we started this case in 1994, my son was in ninth grade. He's now a fourth-year resident, so it's been going on for a significant period of time. And I'm just going to try to focus on, I think, just a few issues. Significant underlying, overlying issue through all these patents is the written description requirement. Yeah, and don't you have, in all three, the same spec? Essentially, yes, Your Honor. Well, they're continuations of each other, so same spec. You've got essentially slightly varying generic claims, reciting function, and you've got one example. And why isn't this on all fours with Lilly and subsequent cases and with the PTO's written description requirements? Because the biological material we're dealing here with is bacteria. And we have to go back and take a look in 1984, what the level of skill in the art was, what was known in the art. With regard to bacteria, you are correct that our specifications talk about the E. coli polygene. And you've got one described, which is deposited. That's correct. And it is our position that the E. coli polygene, E. coli bacteria, which is a prokaryotic material, is really one of the simplest systems that exists. And this is a special case, because if you look at... Sodium is simpler than the chemical... The development of the law progressed with chemical genuses, which have got to be simpler than bacterial genuses. But the issue here is that if I look at Lilly, and I look at Faulkner, and I go ahead and look at Capon, those are all eukaryotic organisms. And we go back to Lilly. That was a cDNA. That was novel. It was what? It was novel. I said that cDNA that expressed rat insulin was novel. It didn't exist. At the time of our invention, the polygene was known. There was a tremendous amount of work that was done with E. coli. You said a polygene. I mean, the polygene isn't just one. No, the polygene... It's a family, but one, certainly, yours, was known, right? Well, it was certainly known at that time that all bacteria would have a polygene. But not the same polygene. They are not the same, but there are similarities. And, yes, some of the similarities are in which we've been focused on this case for the last 14 years, is the polygene will go ahead and encode for DNA polymerase activity that includes nick translation activity. Polygenes do that. And the issue here is, if I look at your later cases, I would look at Lilly. I go ahead and I look at Kaplan. And if I look at those, the fact that you really are dealing with eukaryotes, I submit, makes a difference because the sequencing of the gene, the polygene of E. coli had been sequenced. But by 1984, it was not difficult to sequence a gene. It was not difficult, excuse me, it was not difficult to sequence a polygene. It was not difficult to obtain a polygene. If it wasn't so difficult and state-of-the-art, why didn't the specification have more exemplification of other species in the genus? I'm sort of analogizing this to Lilly because it was so early in the development. It is very early, but at that time, again, I submit, Your Honors, that you can take a look at what was known to one skill in the art, and that at this point, that the E. coli polygene can be a species that represents a genus. Was this summary judgment? All these were summary judgment, Your Honor. Each of these cases, excuse me, each of those decisions. So there wasn't fact-finding, there was just a conclusion that there was no reasonable... Well, that's correct. ...initial material fact. And we have a combined record in this. I should say a combined joint appendix. And we have testimony from Dr. Bankovic in the first case. We have testimony from Dr. Bankovic. We have from Dr. Lowe, from Dr. Davis, and Dr. Halfin in the second case. All saying, when they read this... Excuse me. Dr. Lowe specifically says when he reads the specification, he does believe that based on the description of the E. coli polygene and the E. coli DNA polymerase I that's expressed by the gene, that he believes reading the specification in context and what one skill in the art understands the art to be in 1984, that the specification does show that the inventor was in possession. But you can't point to others. You know, one of the problems... I'm sorry. You can't point to other species in the spec. One of the problems with this whole... That's correct. ...possession, which goes back to, I think, Judge Rich, possession really means not just possession in your laboratory, like you use a 131 after David to show you had it in your laboratory to anti-data reference. It means possession as shown by the specification, because that's the purpose of a patent, to disclose and describe to the public. And just to say, I would have read it to recognize that there were others, doesn't mean it was disclosed, described. But the specification is written to one skill, the art. And I suggest you need not include in the specification what would be well known to one skill in the art in that time. Like other aspects of the invention? No. Not other aspects of the invention. The backdrop against which the invention is placed. And this is a unique case. I don't disagree with you. Well, I'm not sure it can be. It seems to me it's like Lilly. Well, but I suggest it's not like Lilly, because, again, Lilly... You're saying the difference is between a gene, a chemical material, and a plasmid. These are planes to plasmids, right? Well, this is plasmid, and so was Lilly. But I submit that the patentability, the novelty, or a significant point of novelty on Lilly was the cDNA. In our case, the polygene, the portion of the DNA coding sequence that we put into our plasmid, that was known. Basically, I suggested to this court that this is, again, unique. We really have a combination of known elements. We have the cloning plasmid, which in our situation, in the preferred example, was called the P-Hub2. We have a DNA coding sequence that encodes for polymerase activity that includes this nick translation activity, which is the 5'3' exonuclease. What you have is a coli invention trying to claim a tat invention. It's like rat insulin trying to claim human insulin. Well, but I submit that we don't, because if you take a look at... Well, you've got to look at the three patents. And in the first patent, the claim calls out for DNA polymerase I. Based on the claim construction that we have from the district court, the district court said that TAC DNA polymerase I is not DNA polymerase I by our definition because it doesn't have the characteristic of 3'5' exonuclease activity. We briefed it. We suggest that claim construction was incorrect. But if you look at the second case, if you look at the second patent, Your Honor, we're not talking about DNA polymerase I. We're talking about a plasmid that has nick translation activity. It doesn't say... And the third case... Was that a description of the plasmid, or is that a description of one property or a result of its use? That's the result of the plasmid's use. But, as I was suggesting to Your Honor, we, in the second case and the third case, we're not talking about a... We do have language that we believe does encompass TAC because, again, TAC was a... There's no question that TAC is a bacteria. No question TAC has a polygene. Was lethal activity a characteristic of, I guess, the enzyme, or was it a problem to be overcome? It was a problem to be overcome. Overexpression of the DNA polymerase I enzyme would result in a lethal debilitating or growth inhibiting effect on the cell. In other words, you're saying the court was wrong considering that one of the characteristics of polymerase. You're moving to the 270 patent. Claim construction. No, claim construction on DNA polymerase I. Right, but the claim construction for DNA polymerase I did talk about the property of DNA polymerase I being lethal debilitating or growth inhibiting, and the claim construction also said that it had the three characteristics. But isn't lethality something you wanted to deter so that the bacterium would grow? That was certainly one aspect, but I submit if you read the patent specifications, Your Honor, that you will find that it is a preferred embodiment, but this really is a technique that permits the overexpression of an enzyme. This is really, I think, somewhat unique, again, because it really provides a biological, it's a system for overexpressing an enzyme. And if we narrow everything down, if this court concludes that the only thing we've disclosed is the E. coli polygene, which basically results in encoding for, excuse me, which expresses the E. coli DNA polymerase I enzyme, you're correct. Then we have an issue. But again, if I read closely, when I read Kapon, I do find the language in Kapon to be quite instructive. What the court said in Kapon, and I think it's Kapon, really in a combination with Kapon and Faulkner. Kapon is a chicken, not a bacterium, isn't it? Well, that's the way I recall it. No, Your Honor, when we were talking about... I was giving you a hard time. No, no, that's correct. But in California we were also talking about the Purdue case, and I thought that might have been a chicken also. But it's not. But if you look at the language in Kapon, if you look at the language in Kapon, I mean, it says, I think, some very interesting things. It says that the descriptive text needed to meet these requirements, which is for written description, varies with the nature and scope of the invention at issue. And with the scientific technologic knowledge already in existence, the law must be applied to each invention that enters the patent process for each patented advance. For each patented advance is novel in relation to the state of the science. Since the law is applied to each invention in view of the state of the relevant knowledge, its application will vary with differences in the state of knowledge in the field and differences in the predictability of the science. That's at Kapon on page 1357. It goes on to say, precedent illustrates that the determination of what is needed to support generic claims to biological subject matter depends on a variety of factors, such as the existing knowledge in the particular field, the extent and content of the prior art, the maturity of the science or technology. Wasn't the structure of the DNA and the prior art known in that case? What am I missing? There was a way to distinguish Lilly in that case because of known structure. Well, to an extent, but here there's no magic to knowing the structure of the polygenes other than E. coli. Again, if you look at... But there was testimony that all the polymerase ones differ, polymerase is different, isn't that right? She hung her hat on something real. I'm sorry, Your Honor. She hung her hat on something real. But she's looking at the polymerases that are expressed by the genes. But I can clone the gene. I mean, I can clone the gene, I can sequence it. For us, I submit that for us to, at that point, I submit that it may have been preferred, but was not necessary to identify the gene coding sequence for other polygenes from other bacteria other than E. coli in the specification. Because, again, this is unique. Now, I submit, because, again, you have Dr. Hatful that says how easy sequencing is at that point. You have Dr. Lowe talking about the state of the art. You have Dr. Bankovic that's put in a declaration. And I have Dr. Davis. And my concern, Your Honors, is that this was on summary judgment. Certainly, I suggest that any inferences as the non-moving party should have been made in our favor. If you look at the testimony. But you know, you're distinctly outside PTO guidelines, which are more recent. I mean, you say you've argued deference to the Patent Office. The Patent Office may well not have issued this these days in light of its guidelines that were issued subsequent to the issue with this patent. And when you look at example four, 2014, it's on all fours. You've got a generic claim supported by one species. It found the generic claim not supported by a written description. The generic species claim to the disclosed species was supported. But the species claim to the not disclosed species, humans, was not supported. So it's quite close. Well, again, and it's not a make-weight argument, I submit, that you really have to look. Again, this is a prokaryotic-related invention. When you look at eukaryotes, it is difficult, at least to my understanding, it is difficult to go ahead. And you can't shotgun clone, it's my understanding, those genes. You have introns, which make it much more difficult. There aren't any introns in a prokaryotic species. And the fact that you could obtain the gene to make your shotgun cloning in 1984, the fact you could go ahead and sequence it once you've obtained it, I submit, are two important facts this Court should take into consideration. Furthermore, Your Honor, when you're looking at this background, again, this is a unique situation. Would I prefer to have more embodiments in the specification? Absolutely. We can't rewrite history. But I do submit that this is a very unique case. And I do, I'm not sure I disagree with you, but I do believe that... I just asked questions. I wasn't ruling. Oh, no, no, no. Look, I'm here to answer any questions you may have. But I do believe that we are not outside the written description guidelines. A single species can support a genus in an appropriate situation. Go back in time. I submit in the brief, and I think, especially the declarations we have from Dr. Lowe, Dr. Brankovic, do submit that in this situation, that a single species does support our claim for a genus. I have 10 seconds left on my 20 minutes. Let me ask the court with regard to... The only other issue, I think, that I'd like to get into at this point in view of the significant briefing, is with regard to the doctrine of equivalence decision that was rendered by Judge Ilston. And the only thing I would like to point out, and yes, I know I am in my rebuttal time, so I will be quick, is I submit that the only element that's really relevant here is if I look at really Claim 7, the claims remaining on appeal here are 4, 5, and 7 with regard to the doctrine of equivalence. Which patent are you in? I'm sorry, Your Honor, I'm in the 7, 4, 5. 7, 45. And there's a doctrine of equivalence decision by the court. That's right. And there was a substitution of the source for the DNA polymerase activity. The original source in the claim said the source was E. coli. And we're looking... And the source for the DNA polymerase inactivity that includes the NIC translation activity in the Roche plasmid is thermosaccharide, because it's TAC. But the element I submit we're looking for is that it's really the source... We're looking for the DNA coding sequence that gives you the polymerase activity that includes NIC translation activity. And the court in California focused on E. coli, said basically, I submit, that there's no equivalence. And to try to do an analogy, we're just looking for the source of the sequence. Didn't she find that the TAC didn't include 3-prime, 5-prime exonuclease activity? I suggest she's reading in an improper limitation, yes. But my analogy would really be if my invention calls for a door from Ford and they have a door from Chrysler. The door is a door. And in this environment... That's a door from Ford. But the door here is really the element, whether it's from Ford or from Chrysler, doesn't make a difference. The source of the DNA that we're looking for, the source that expresses the NIC translation activity. In our claim, it was E. coli. In their invention, it is TAC. Other than that, I submit everything else matched up. We're going to nick your argument time. Thank you, Your Honor. Assuming you want to save it. I do want to save it. Thank you for your attention. Well, here's from Mr. Rabinowitz. Be of your patience. We're here to listen to you. Your Honor, may it please the court. My name is Stephen Rabinowitz. I appear for the defendants of Perle's Hoffman-LaRoche et al. I'd like to address the Eli Lilly issue first because it's central to the resolution of the case with respect to all three patents.  to explain to me what the definition of a patent is? Preliminary to that, did the court err in deciding one of these patents on the Gentry basis rather than E. coli? No, Your Honor. The court did not err. The district court granted summary judgment with respect to the 270 patent based on invalidity under Gentry. We had challenged that patent also under Eli Lilly. And if the court affirms with respect to the 708 patent under Eli Lilly, it may likewise affirm the judgment of invalidity of the 270 patent on the same basis. But the claims of the 270 patent were broadened during prosecution. As originally filed, the claims were directed to a plasmid which contains a coding region that encodes an enzyme that is lethal or debilitating. Almost all of the original claims recited that the coding sequence must encode a DNA polymerase I. And that term, DNA polymerase I, requires that the enzyme be lethal or debilitating. That's an aspect of the claim construction that has not been challenged on appeal. But isn't that... In fact, I thought in your brief you said that it is a problem to be avoided rather than a characteristic of what's claimed. Well, Your Honor, we think that the 270 patent is on all fours with the Spruill patent that was at issue in Gentry. In Spruill, the applicant, the inventor, used the problem of allowing for dual control of parallel reclining couches to define not only the problem that was being addressed, but also to define the invention that was being described. But aren't these claims all generic claims dealing with a limited species disclosure, which wasn't Gentry at all? That is why they are all invalid under Eli Lilly. Why don't you tell us then... I interrupted you. You were going to talk about Lilly. Your Honor, the patents all share a common specification. Dr. Minkley made a narrow contribution by working out where to cut one particular poly-A coding sequence, the E. coli. Do they all claim the same plasmid in different ways? They claim a class of plasmids. Yes, a group of plasmids. And the novel feature of the plasmid is that the plasmid must contain the poly-A coding sequence, not the gene, but the coding sequence, which is placed under control of a regulatable promoter which functions as a switch. In order to place the poly-A coding sequence under control, it was necessary to cut it at the right place in order to remove or damage the endogenous promoter. The patent says expressly this is an important discovery of the invention. What Dr. Minkley did was he worked out where to cut one particular poly-A gene, the E. coli poly-A gene, at what was called the bagel-2 restriction site. And that allowed him to place that particular gene under control. Bagel restriction site? Bagel-2, B-G-L-2. B-G-L-2, right, it looked like three. It's pronounced bagel-2. It wasn't something that had a hole in it. No, Your Honor. And Dr. Minkley admitted in his testimony his patent teaches nothing about where to cut other poly-A genes and it couldn't because only one member of that very broad class had been sequenced in the prior art. And as Dr. Benkovic admitted, and we quote his testimony in our brief, the patent disclosure teaches nothing about the structure, the sequence, the common defining features of the class of poly-A genes in general, and couldn't because it wasn't known at that time. You had one example. It wasn't possible to know at the time this application was filed in 1984 whether they were common structural features or what they were. You say it wasn't possible to know in the sense that it wasn't known or it wasn't possible to determine relatively easily given the state of the art. Your Honor, you had a single example and it would be necessary to have multiple examples and compare them to see whether they contained common structure. Since only one member of the entire broad class had been sequenced, it was impossible to predict whether they would be common features when others were sequenced or what those features would be. But the sequencing of the others would have been within the scale of the art at that time. Well, if you could clone them, then you could sequence them. But that we submit goes to enablement, not description. This is what the Eli Lilly case called a wish or plan to obtain those other sequences. It's what the Eli Lilly case called naming genes that are generally known to exist and describing a method for going out and obtaining them. You mentioned enablement. Let me ask you a question that goes perhaps beyond the four corners of the briefing in this case, but I'm interested in your response. What do you think, and you may be able to refer in responding to this question to this case or this class of problems that we have before us, but what do you think is the difference between an assertion of failure of written description and an assertion of failure to enable the full scope of the claim as the claim is a broad claim made, such as the claim in this case? Your Honor, from a practical litigation point of view, written description requires that the focus of the inquiry be on the disclosure of the patent itself. As opposed to what one of skill in the art could have done? Well, enablement turns on whether or not it would have required undue experimentation for others to go out and find other things. Are you saying that the skill of the art is more relevant to enablement than to written description? It's relevant in a different way. The written description has to be there where the enablement can be known to the skill of the art. That's correct, Your Honor. The written description takes account... The patent office guidelines talk about the knowledge and skill of the art. In other words, in a case like Capon, which Mr. Collin referred to, there are thousands and thousands of sequences, members of the class were already known and described in the art. It's not necessary, this court explained in Enzo, or ending Capon, it's not necessary to disclose again in the specification what is already known in the art. So to that extent, the knowledge and skill in the art is pertinent to description. But what you can't do is say, I'm describing one member of a class that's known to be broad, no other members are described yet. And nevertheless, I'm going to put that limitation in my claim and rely on it as part of my claim, but not describe any but a single example. But there would be cases, would there not, in which a single species would both enable and describe a genus, right? There would certainly be examples that you could think of. That's the case, Your Honor, where the claim confines the species to a narrow... confines the genus to a narrow genus that doesn't vary much. For example, that aspect of the written description guidelines was approved in the Enzo case. And that's the distinction between example 9 and example 17 of the training materials. Example 9, which the court adverted to in the Enzo case, concerned a genus that was defined by their common property that they hybridized under stringent conditions to the same targets. That defines the genus as one that is structurally very similar. And the guidelines explain that a narrow genus like that can be described by a single example, in part because there is a known correlation between the function of hybridizing under those conditions to a defined target and structure. By contrast, when the genus is defined functionally by its capacity to encode proteins, that is a variant genus that cannot be described by a single example. And we have evidence in the record showing that this particular class, PolA genes, is even more variable than the cDNAs encoding insulins in mammals and vertebrates that was at issue in Delhi. And without... again, I know this issue is not really in the case as brief, but would you say that the claims in this case are enabled but not described? Well, if it came to that, we would say they are not. For purposes of summary judgment on written description, most of the evidence that Carnegie Mellon put in in opposition to summary judgment concerned enablement, and we argued to the court it should assume that those statements were true and it should assume that it was enabled. But this comes down to the distinction drawn in the Eli Lilly case itself, which said whether or not there's enablement, the issue is one of written description, and we think this is on all fours with that case here. So, Your Honor, the facts material to written description were not disputed. Dr. Davis at his deposition, Dr. Benkovic at his deposition specifically conceded all the facts on which the district court relied in finding the claims invalid for lack of written description. And the declarations that the appellants rely on relate to either techniques for going out and finding other genes, what the case is called a wish or plan for obtaining those other members of the genus, or else the functions of the enzymes that would be encoded by the plasmids, but not the properties of the coding sequence which is required by the claims. When was Roche sued its fact product, roughly, under these patents? The suit was initiated in 1994, Your Honor. And the plasmids that are the PLSG5 plasmid, which is the accused technology at issue in this case, is fully described in a patent application that Roche filed in 1987, before even the first patent in suit here issued. So, Your Honor, let me turn briefly to the issue of no infringement of claims 4, 5, and 7 of the 7, 4, 5 patent. Which were not held to be invalid, right? Those were the residual claims, the ones that were not challenged, for the reason that they confined the claims. E. coli. That's correct. They recited the bacterial source must be E. coli. And I think the most important point to make is the source defines the nature of the coding sequence. It's like saying a cDNA from rat or a cDNA from a mammal. It's a different cDNA, it encodes a different protein. One encodes rat insulin, the other encodes any mammalian insulin, whether it's human or cow or pig. What about the answer to your opponent that Lilly is distinguished because Lilly involved compounds and these involved plasmids from microorganisms? Well, both Lilly and this case involved plasmids containing coding sequences. It's true that Lilly concerned eukaryotes and this case concerns bacteria, but the principles of Lilly were applied in the Enzo case. And the Enzo case concerned bacteria, just as this case does. And in fact, the Enzo case dealt with a patent which was filed on an application, which stemmed from an application filed in 1986 when the art was presumably more advanced than 1984, which is when these patents were filed. So I don't think there's any distinction to be drawn from Eli Lilly and its progeny in respect either of the fact that these deal with bacteria or that the applications were filed later than the patents at issue in the Eli Lilly case. Now, as for the issue of non-infringement of the remaining claims of the 745 patent, only three are actually challenged here. We think it may be affirmed either on the basis that the district court applied, namely that they failed to show equivalent satisfaction of the E. coli bacterial source limitation, or in the alternative, they offered no evidence to satisfy the AMBA mutation provised, that the bacterial source, not the plasmid, the bacterial source, had to lack an AMBA mutation affecting the expression of the non-infringement. A negative limitation. That's correct. A negative limitation that was made more restrictive. As originally filed, the claims required that the mutation be absent merely from the sequence in the plasmid, but the claim was narrowed during prosecution to require that the mutation be absent not merely from the sequence moved into the plasmid, but from the bacterial source as a whole. And the evidence showed that bacteria do contain sometimes mutations of regulatory genes which can affect expression of other genes, and there was no evidence whatsoever presented to satisfy that limitation. But as to the bacterial source limitation, claim 4 requires that it be from a bacterial source. Claim 5 limits it further by specifying that the bacterial source must be E. coli. And the theory of equivalence that Carnegie Mellon relied on in that case essentially said, by their function-way result analysis, the function is one that is, whenever the plasmid satisfies the other express limitations of the claim, then it equivalently satisfies the E. coli source limitation. And we think that we present that in tabular form in our brief. And that is a theory of equivalence that's proscribed by the Supreme Court's decision in Warner-Jenkinson. It would effectively erase the limitation in question as a meaningful restriction on the claim. In effect, they used taxonomy to cabin claim 5 by reciting E. coli by its genus and species, and then they argued taxonomy is irrelevant. That's not permissible. Your Honor, I'm not sure if you would like me to address the issue of claim construction and the evidentiary and infringement issues. I can do so. Nothing further from my standpoint, and no one ever loses credit by giving time. In that case, Your Honor, I surrender the balance of my time. You surrender it to us, not to Mr. Colvin. That's correct, Your Honor. Your Honors, I will not take any of Mr. Rabinowitz's time. I will try to finish in less than the 7 minutes and 15 seconds I have of my time. Just a couple points. I want to make sure that I've not confused the Court. With our invention, we don't need to know the sequence in order for our invention to work. We just need to be able to clone that gene, which was known at that point in time, put it into the plasmid for our construct. Well, of course, the claims to the E. coli, whether they're specific to the deposited strain or not, were not invalidated. Correct. And there's no cross-appeal on those. So those sit there. We're talking about the generic claims. I'm talking about the generic claims. I'm just saying I think a unique aspect of this case of our invention, we don't need to know the sequence. Polygenes, at that point in time, 1984, were known to have nick translation activity and polymerase activity. And the techniques were there, which permitted us to obtain those genes through what was called shotgun cloning. So I think that's really a difference with real distinction here. With regard to the doctrine of equivalence argument that's before the Court, I don't believe that we are reading the element out. The element's not E. coli. It's the gene coding region that expresses nick translation activity. Which claim are we talking about? If I look, it's going to be claims 4, 5, and 7 of the 7, 4, 5 patent, but specifically claim 7. Claim 7, if you look at that claim, I mean, let me just read it slowly. But if claim 7, which incorporates the limitations of some of the preceding claims, the way I have recast it would read, a recombinant plasmid containing a DNA coding sequence for the expression of DNA polymerase activity. I submit there's no dispute PLSG5 has that. The next element be wherein said DNA coding sequence is derived from a source that encodes bacterial DNA polymerase. PLSG5 has that. Said source not containing any mutation affecting expression of said polymerase activity. Now, Mr. Rabinowitz has said that's a limitation we put no evidence in on. I respectfully submit, Your Honor, we have several declarations from Dr. Lowe on that specific issue, and I can re-ask the Court to look at, in the record, A19059 through A19061, A19329 through A19331, a third declaration, which is A18859 through A18863. Another declaration from Dr. Lowe has, in the record, A19059 through A19061. A final declaration from Dr. Lowe, A19329 in the record, A19331. Submit that. Would you read those? We have gone ahead and we have presented evidence with regard to that limitation where it says in said source not containing any mutation affecting expression of said DNA polymerase activity. Again, we're on summary judgment in front of the Court. There's no factual hearing. The next element is I've recast the claim such that when said plasmid is transformed into a bacterial host system, the host system can grow and divide, thereby replicating a plasmid. PLOG5 has that. The next element, wherein said DNA polymerase activity includes NIC translation activity, and wherein the NIC translation activity includes the polymerase and 5'-3'-X. Okay, you're down to claim 2 now. Yes, I'm just reading it, but basically, I mean... The next of the claims all the way down to the 7, I guess. They basically stack. Okay. But it really comes down to where it really is the source for the DNA, the source that encodes the bacterial DNA polymerase that has NIC translation activity, which is the 5'-3'-X nucleus activity and the 5'-3' polymerase activity. And all I'm saying, Your Honors, is that it's not the E. coli that's a limitation. That claim's talking about the DNA coding sequence. I can find that relevant DNA coding sequence in E. coli. I find the same relevant DNA coding sequence intact. And when looking at the coding sequence needs to provide NIC translation activity. There's no dispute in this case that the PLSG5, that plasmid, will express an enzyme that has NIC translation activity. So, as I said, if you focus just on the limitation of E. coli, then Mr. Rabinowitz is right, but that's not the limitation. Limitation is really the specific, it's the DNA coding region that expresses NIC translation activity. The lower court had a concern with regard to the breadth of what we're going to do with the doctrine of equivalence. All I can tell you is that the PLSG5, that fits. We're not saying it fits for anything else. That's not the issue before the court in California. It was an issue before the court here. But in this situation, we submit that under the doctrine of equivalence, and even if you just look at Claim 7, every element is there. That it's essentially the same elements that we had in connection with our environment when you have E. coli. So I submit it's there. The final point in my 59 seconds is, I still, I just want to go back to where I opened up, is that this case, all the decisions that have been appealed were rendered on summary judgment by the court. And, your honors, there is, from the federal circuit, there is the Metropolitan Life Insurance Company case of her versus Bancorp that was issued on June 2, 2008. And I read that case to go back to basically the standards on summary judgment, where it says, Credible determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts of jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or a directed verdict. The conflict in declarations created a genuine issue of material fact in Metropolitan Life, and I suggest that, at a minimum, they created a genuine issue of material fact here. And, thank you. I have two seconds left, but thank you, your honor. Thank you, Mr. Colan. Both good arguments. The case should be taken under advisement. Thank you, Olin.